## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CAROLE BASKIN and          Case No.:  8:21-cv-02558-VMC-TGW
HOWARD BASKIN,

  Plaintiffs,

vs.

ROYAL GOODE PRODUCTIONS LLC and
NETFLIX, INC.,

  Defendants.

_____

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants Royal Goode Productions LLC ("RGP") and Netflix, Inc.

("Netflix") (collectively, "Defendants") respectfully submit this memorandum in

opposition to Plaintiffs Carole Baskin ("Carole") and Howard Baskin's (collectively,

"Plaintiffs") Emergency Motion for a Preliminary Injunction (D.E. 4). In opposition,

Defendants state as follows:

### INTRODUCTION

Plaintiffs' Motion to prohibit Defendants from using unspecified footage of

them in the upcoming documentary series titled *Tiger King 2* strikes at the heart of the

First Amendment. Plaintiffs invite this Court to enter an unconstitutional prior

restraint on speech. If threats to the national security of the United States, criminal

violations of federal and state statutes, invasions of privacy, breaches of

1

confidentiality and "calculated misdeeds" are not enough to warrant prior restraints, an allegation about a *possible* breach of contract surely cannot suffice. Notwithstanding the constitutional obstacle, Plaintiffs do not satisfy any of the elements necessary to obtain the extraordinary relief they seek. The Motion should be denied.

## BACKGROUND

In 2014, RGP contacted Carole to gauge her interest in participating in a docuseries on wildlife trade. *See* Declaration of Jeremy McBride ("McBride Decl."), filed simultaneously herewith, ¶ 3. From 2014 to 2019, RGP filmed Plaintiffs in connection with the docuseries. *Id.* In the Complaint and their sworn declarations, Plaintiffs' claim to have signed only two appearance releases—in April 30, 2016 and April 3, 2018 ("the Pre-2019 Releases"). (D.E. 1 ¶ 23; D.E. 1-7 ¶¶ 15-17; D.E. 1-9 ¶¶ 12-14, 17). Contrary to those representations, Plaintiffs executed a total of *nine* appearance releases and *two* location release agreements. McBride Decl. ¶¶ 3-7, Exs. A-D. The appearance releases and location agreement signed in 2019 (collectively, "the 2019 Agreements") supersede the Pre-2019 Releases and explicitly permit Defendants to use the footage in later projects. *Id.* ¶ 4, Comp. Ex. A at p. 5; ¶ 5, Comp. Ex. B at p. 4; ¶ 7, Ex. D.

RGP eventually used the footage in a docuseries exploring the subculture of people who collect and breed big cats. *Id.* ¶ 2. Netflix released the seven-part docuseries, titled *Tiger King* on March 20, 2020 ("*Tiger King 1*"). *Id.*; *see also*

Declaration of Sean Dobson ("Dobson Decl."), filed simultaneously herewith, ¶ 2. Although it featured several notable characters and subplots, *Tiger King 1* centered on Joseph Maldonado-Passage a/k/a Joe Exotic's antagonistic relationship with Carole, including Carole's criticisms of Joe's animal care and Joe's claims about the disappearance of Carole's ex-husband, Don Lewis. The seventh episode concludes with Joe's 22-year conviction for violating the Endangered Species Act and his murder for hire plot aimed at Carole.

*Tiger King 1* was an instant hit, with 64 million households watching the docuseries within the first month. Dobson Decl. ¶ 3. The docuseries was nominated last year for six Primetime Emmy Awards, including "Outstanding Documentary or Nonfiction Series."[1] *Tiger King 1's* popularity spawned competing content, such as a limited series by CBS and a documentary by Investigation Discovery that focused on the more salacious details behind Carole's ex-husband's disappearance.[2] The popularity generated by *Tiger King 1* continues to this day: Plaintiffs have agreed to produce and star in a discovery+ docuseries scheduled to be released on November

---

[1] *See Tiger King Awards & Nominations*, Emmys.com https://www.emmys.com/shows/tiger-king-murder-mayhem-and-madness

[2] *See* CBSNews, *"48 Hours Suspicion: The Tiger King Mystery" uncovers shocking new details in the disappearance of Carole Baskin's former husband Don Lewis*, CBSNews.com (Sept. 4, 2020) https://www.cbsnews.com/news/the-tiger-king-mystery-48-hours-suspicion-new-clues-carole-baskin-former-husband-don-lewis/; *see also* Newsroom, *Tiger Tales of Missing and Murder: Investigation Discovery Unleashes Two New Specials, Featuring Exclusive New Jailhouse Interviews with Joe Exotic*, Discovery.com (Sept. 10, 2020) https://corporate.discovery.com/discovery-newsroom/tiger-tales-of-missing-and-murder-investigation-discovery-unleashes-two-new-specials-featuring-exclusive-new-jailhouse-interviews-with-joe-exotic/

13—just days before *Tiger King 2*.[3]

As a result of *Tiger King 1*, Carole became a pop-culture phenomenon. By her own account, "186 media outlets" contacted Carole after the release of *Tiger King 1*.[4] Carole embraced the publicity. Shortly after the docuseries' release, she engaged DMA United—a major public relations agency—to handle her business inquiries and promote her affiliation with *Tiger King 1*. Carole participated in numerous press interviews and even competed on ABC's reality dance show, *Dancing With The Stars*.[5] Carole directly attempted to monetize her fame by using an app called "Cameo" which allows users to hire celebrities to create short, personalized video messages.[6] Carole, whose profile identifies her as a "Netflix - Tiger King" star, became one of

---

[3] *See* Kelli Bender, *Carole Baskin Swaps Tiger King for Cage Fight, Her Own 'Unfiltered' Special About Big Cats*, People.com (Nov. 2, 2021) https://people.com/pets/carole-baskin-cage-fight-show-discovery-trailer/

[4] Big Cat Rescue, *Carole Baskin Dancing With The Stars*, News @ BCR (2020) https://bigcatrescue.org/carole-baskin-dancing-with-the-stars/?gclid=Cj0KCQjw5oiMBhDtARIsAJi0qk0wWeyVdWJAmv_luqieAb9PIdQQmyscOS7eWYeHpHnEhGkT46C-R7kaAg23EALw_wcB

[5] Allison Crist, *Carole Baskin Sounds Off on Why Tiger King "Really Missed the Mark,"* Eonline.com (Dec. 22, 2020) https://www.eonline.com/news/1221349/carole-baskin-sounds-off-on-why-tiger-king-really-missed-the-mark (stating that "fortunately . . . people see I am not the villain."); *see also* Cassie Gill and Jason Brow, *Carole Baskin: 5 Things to Know About The 'Tiger King' Activist Joining 'DWTS'*, HollywoodLife.com (Sept. 2, 2020) https://hollywoodlife.com/feature/who-is-carole-baskin-3983414/; Christina Dugan, *Carole Baskin Says Tiger King Was 'a Total Assassination of My Character'*, People.com (Sept. 9, 2020) https://people.com/tv/carole-baskin-says-tiger-king-was-a-total-assassination-of-my-character-but-becoming-living-caricature-has-helped-cats/ (acknowledging she's "been dealing with death threats and people attacking [her] for *decades*") (emphasis added).

[6] Travis M. Andrews, *Inside Cameo, the app where Carole Baskin from 'Tiger King' will sing 'In Da Club' for $299*, The Washington Post (Aug. 14, 2020) https://www.washingtonpost.com/technology/2020/08/14/cameo-carole-baskin-tiger-king-celebrity-videos/

the most requested celebrities on Cameo in the last year, collecting $28,000 in a single day on the service.[7] Carole also began selling facemasks with the "Hey all you cool cats and kittens" catchphrase *Tiger King 1* made popular and launched her own digital currency, $cat.[8]

Though Plaintiffs have voiced their displeasure with their portrayal on the docuseries, Carole has likewise publicly discussed the positive effects of *Tiger King 1.* In addition to financially benefiting Carole, the docuseries also "exploded" the big cat debate, leading to reform in the industry and the indictment of wildlife traffickers.[9] As Carole admits, if *Tiger King 1* had focused solely on the animal abuse she "do[es]n't know if people would have watched [the docuseries], shared it the way they did. But at least this opened the door [to the big cat debate]."[10]

---

[7] Kevin Webb and Reece Rogers, *Cameo lets you hire celebrities like Lindsay Lohan and Caitlyn Jenner to create personalized videos that make memorable gifts*, Business Insider (Oct. 21, 2021) https://www.businessinsider.com/what-is-cameo; *see also* GQ Staff, *Tiger King Star Carole Baskin Made $28k in a Single Day on Cameo*, GQ (July 5, 2020) https://www.gq.com.au/entertainment/film-tv/tiger-king-star-carole-baskin-made-28k-in-a-single-day-on-cameo/news-story/6bb101542da234210ee5fe9fe7d95993

[8] Gabriella Calise, *Big Cat Rescue founder Carole Baskin is selling coronavirus mask*, Tampa Bay Times (May 17, 2020) https://www.tampabay.com/news/florida/2020/05/17/big-cat-rescue-founder-carole-baskin-is-selling-coronavirus-masks/; Marianne Garvey, *'Tiger King' star Carole Baskin launches cat-themed crypto coin*, CNN (May 5, 2021) https://www.cnn.com/2021/05/05/entertainment/tiger-king-carole-baskin-crypto-coin/index.html

[9] Tim Lewis, *Carole Baskin: 'After Tiger King, my phone rang every two minutes for two months'*, The Guardian (2020) https://www.theguardian.com/world/2020/dec/05/carole-baskin-tiger-king-faces-of-2020; *see also* Veronica Stracqualursi and Daniella Diaz, *Invoking 'Tiger King,' House passes bill banning big cat ownership*, CNN (Dec. 4, 2020) https://www.cnn.com/2020/12/04/politics/tiger-king-house-bill-big-cat-ownership/index.html

[10] Lewis, *supra* note 6.

After the success of *Tiger King 1*, RGP elected to produce a sequel, *Tiger King 2*, which will stream on Netflix beginning November 17. *See* McBride Decl. ¶ 8; Dobson Decl. ¶¶ 4-5. On September 23, 2021, Netflix first announced that there would be a second season. Dobson Decl. ¶ 5. On September 25, 2021, Netflix hosted its first ever online global fan event. *Id.* ¶ 6. It garnered more than 690 million views and included a teaser trailer announcing *Tiger King 2*. *Id.* The teaser trailer contained several clips of Plaintiffs and other characters from *Tiger King 1*. *Id.*; *see also* McBride Decl. ¶ 9. A month later, on October 27, 2021, Netflix released the official trailer for *Tiger King 2*. Dobson Decl. ¶ 7; McBride Decl. ¶ 10. The trailer features ten seconds' worth of footage of Plaintiffs. *Id.*

Five weeks after the public release of the teaser trailer, Plaintiffs sued, alleging a breach of contract claim in connection with their appearance in *Tiger King 2*. (D.E. 1). Plaintiffs allege that the Pre-2019 Releases (which were superseded by the 2019 Agreements omitted from Plaintiffs' filings) do not permit Defendants to reuse the footage in a sequel. *Id.* With the Complaint, Plaintiffs filed this Motion,[11] which asks this Court to block any footage of them or Big Cat Rescue from appearing in *Tiger King 2*.

---

[11] Plaintiffs' Motion also sought a temporary restraining order, which this Court promptly denied because it was not convinced the anticipated injury qualified as irreparable or that enjoining the release of the docuseries was in the public's interest. (D.E. 8 at p. 3-4).

# ARGUMENT

Plaintiffs' request is a quintessential attempt at a prior restraint that would violate clearly established constitutional rights and should be denied. But even if the First Amendment to the U.S. Constitution did not preclude the relief sought, Plaintiffs have not come close to meeting their burden for injunctive relief. Plaintiffs have not established any irreparable harm they will suffer, nor have they shown they are likely to succeed on the merits. Likewise, the balance of hardships favors Defendants, and *Tiger King 2* is very much of public interest and relevance to tens of millions of viewers.

## I.   *Plaintiffs seek an unconstitutional prior restraint.*

The Supreme Court has long emphasized that a request to enjoin a publication—*i.e.*, a prior restraint—comes to a court with a "heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also N.Y. Times Co. v. U.S.*, 403 U.S. 713, 714 (1971) (per curiam). Prior restraints constitute "one of the most extraordinary remedies known to our jurisprudence" and are universally recognized to be "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 562 (1976); *see also CBS, Inc. v. U.S. Dist. Court*, 729 F.2d 1174, 1177 (9th Cir. 1984) ("the first amendment informs us that the damage resulting from a prior restraint—even a prior restraint of the shortest duration—is extraordinarily grave"). Indeed, years of unbroken precedent establish a "virtually insurmountable

barrier" against the issuance of just the sort of prior restraint sought here. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring); *see also Psihoyos v. John Wiley & Sons, Inc.*, No. 11-cv-1416, 2011 WL 463172, at *3 (S.D.N.Y. Oct. 4, 2011) (plaintiff must "unequivocally show its entitlement to the relief sought from both a legal and factual perspective" before court will "intrude" to enjoin publication).[12]

In fact, "the Supreme Court has never upheld a prior restraint, even faced with the competing interest of national security or the Sixth Amendment right to a fair trial." *Bollea v. Gawker Media, LLC*, No. 8:12-cv-02348, 2012 WL 5509624, at * 2 (M.D. Fla. Nov. 14, 2012) (in "all but the most exceptional circumstances, an injunction restricting speech pending final resolution of constitutional concerns is impermissible."); *see also CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (Blackmun, J., concurring) ("Nor is the prior restraint doctrine inapplicable because the videotape was obtained through the 'calculated misdeeds' of CBS"); *N.Y. Times*, 403 U.S. at 723-24 (rejecting government's request to enjoin publication of the Pentagon Papers, which had allegedly been stolen, despite allegations of imminent impairment of the national security); *Santelli v. Van Erp*, No. 8:17-cv-1797, 2018 WL 2152095, at

---

[12] The bright line drawn around prior restraints is so fundamental that several Supreme Court opinions have expressed the ban on judicial injunctions against publication as an absolute. *See, e.g.*, *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907) (the main purpose of the First and Fourteenth Amendments "is to prevent all such *previous restraints* against publications as had been practiced by other governments") (internal quotations marks and citations omitted) (emphasis in original); *Grossjean* v. *Am. Press Co.*, 297 U.S. 233, 249 (1936) (the First Amendment "meant to preclude the national government . . . from adopting any form of previous restraint upon printed publications, or their circulation").

*1 (M.D. Fla. May 10, 2018) (Covington, J.) (adopting recommendation denying preliminary injunction of Internet articles and blog posts); *Food Lion Inc. v. Capital Cities/ABC, Inc.*, No. 6:92-cv-00592, 1992 WL 456652, at *2 (M.D.N.C. Sept. 28, 1992) (refusing to enjoin broadcast of hidden-camera footage despite allegation that "Defendants secured the [videotape]material in question unlawfully"). To be sure, "'[p]rohibiting [publication] is the essence of censorship,' and is allowed only under exceptional circumstances." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 225 (6th Cir. 1996); *see also Bollea*, 2012 WL 5509624, at *4 (refusing to enjoin sex tape despite allegation of invasion of privacy).

In short, because the "dominant purpose" of the First Amendment was to outlaw prior restraints, there is both a "'heavy presumption against [their] constitutional validity'" and "'a heavy burden of showing justification for the imposition of such a restraint.'" *N.Y. Times,* 403 U.S. at 714; *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558-59 (1975) ("[t]he presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties"). In a case such as this, therefore, "publication must threaten an interest more fundamental than the First Amendment itself" to justify a prior restraint. *Procter & Gamble*, 78 F.3d at 227.

The relief sought by Plaintiffs—to enjoin the release of footage in *Tiger King 2*—would be a prior restraint in plain violation of the United States and Florida constitutions. Plaintiffs' Motion, which is silent on these First Amendment concerns, does not come close to justifying a prior restraint. Instead, remedies for any such

alleged breach must be pursued *after* publication. This distinction between "prior restraint" and "subsequent punishment" is based on a "theory deeply etched in our law," that "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them . . . beforehand." *Se. Promotions*, 420 U.S. at 558-59.

In this case, Plaintiffs can pursue whatever claims they believe they may have for damages *after* the dissemination of the footage. They may not, however, invoke the extraordinary remedy of prior restraint. A different outcome would contravene the First Amendment.

## II.  *Plaintiffs cannot satisfy their burden of proving entitlement to a preliminary injunction.*

Even assuming Plaintiffs could overcome the extraordinary constitutional prohibition on prior restraints—which they cannot—injunctive relief is an extraordinary and drastic remedy granted *only if* the movant establishes: (1) a substantial likelihood of success on the merits; (2) irreparable harm unless the injunction issues; (3) the threatened injury outweighs the potential harm the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not disserve or be adverse to the public interest. *Forsyth Cnty. v. U.S. Army Corps of Eng'r*, 633 F.3d 1032, 1039 (11th Cir. 2011); *Florida v. U.S.*, -- F. Supp.3d --, 2021 WL 1985058, at *5 (M.D. Fla. May 18, 2021) ("the entry of a preliminary injunction is the exception rather than the rule"). However, there is "a fundamental difference between a standard [order] issued under Rule 65 of the Federal Rules of

10

Civil Procedure in a non-speech context and a special injunctive order granting a prior restraint. . . . [T]he latter . . . is a different beast in the First Amendment context." *Procter & Gamble*, 78 F.3d at 226. Plaintiffs cannot meet their burden of showing they are entitled to such extraordinary relief.

### A. Plaintiffs are unlikely to prevail on the merits of their claims.[13]

Plaintiffs bear the burden of proving a substantial likelihood of success on the merits of their breach of contract claim. They cannot do so for several reasons. First, Defendants did not have to obtain appearance releases from Plaintiffs to use the footage in *Tiger King 2*, and nothing in any of the appearance releases prohibits use of the footage. Second, the Pre-2019 Releases grant Defendants the right to use the footage in sequels. Third, the 2019 Agreements (the agreements that actually govern this dispute) explicitly permit Defendants to use the footage in later projects. Finally, Plaintiffs cannot and do not allege compensable damages.[14]

---

[13] Because Plaintiffs sued in response to Defendants' constitutionally protected expression, Plaintiffs' lawsuit also violates anti-SLAPP laws and further evidences their inability to succeed on the merits and the likelihood that Plaintiffs will be required to pay Defendants' fees in connection with this suit. *See* N.Y. Civ. Rights Law § 70-a(1)(a); § 76-a(1)(a); *see also* Fla. Stat. § 768.295.

[14] Plaintiffs' lawsuit also fails because it was brought in violation of the 2019 Agreements' forum selection clauses, which require that any suit be brought in New York. *See* McBride Decl. ¶ 4, Comp. Ex. A at p. 5; ¶ 5, Comp. Ex. B at p. 4; ¶ 7, Ex. D. "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. As a consequence, a district court may consider arguments about public-interest factors only. Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Smith v. Oasis Legal Finance, LLC*, No. 8:17-cv-2163, 2017 WL 4922271, at *3 (M.D. Fla. Oct. 31, 2017) (Covington, J.); *see also Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215-16 (2d Cir. 2014) (forum selection clause appearing in the most recent, superseding contract holds sway); *accord Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011). Defendants reserve the right to seek transfer under the doctrine of *forum non conveniens*.

**1. Appearance releases are not required.**

Plaintiffs' request for a preliminary injunction is based on the fallacy that Defendants had to obtain any appearance release to use or reuse footage in *Tiger King 2.* Appearance releases are routinely obtained in the film industry to reinforce a media defendant's ability to use an individual's name and likeness. Appearance releases reduce the chances of unwarranted litigation. They are not, however, required under any law.

To be sure, individuals do not have the sole right to tell stories about their lives, and films may be made about such individuals, without giving rise to legal claims. *See Tyne v. Time Warner Entm't Co., L.P.*, 204 F. Supp. 2d 1338, 1342 (M.D. Fla. 2002); *see also Loft v. Fuller*, 408 So. 2d 619, 621 (Fla. 4th DCA 1981) (requiring consent of people portrayed in movie based on true story "would have an unconstitutional 'chilling' effect upon the First Amendment"); *Man v. Warner Bros. Inc.*, 317 F. Supp. 50, 52 (S.D.N.Y. 1970) (defendant did not need to obtain consent to show plaintiff's image or likeness in film). For decades, courts have uniformly rejected claims of misappropriation of rights for this very premise. *See, e.g.*, *Loft*, 408 So. 2d at 621; *Tyne v. Time Warner Entm't, L.P.*, 901 So. 2d 802, 808-10 (Fla. 2005); *Loft*, 408 So. 2d at 623 (acceptance of claims "would result in a substantial confrontation between this statute and the first amendment").

Under Florida law, to maintain a cause of action for misappropriation of name or likeness, a plaintiff must allege that his or her name or likeness "is used *to*

*directly promote a commercial product or service*, such as T-Shirts, hats, coffee mugs, etc." [15] *Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255, 1258 (S.D. Fla. 2010) (emphasis added). Use of a person's name or likeness in a docuseries does *not* qualify as a commercial purpose and is fully shielded. *Tyne*, 901 So. 2d at 810 ("the term commercial purpose as used in section 540.08(1) does not apply to publications, including motion pictures, which do not directly promote a product or service"); *accord Fuentes*, 721 F. Supp. 2d at 1258; *Loft*, 408 So. 2d at 621-22; *see also Nichols v. Moore*, 334 F. Supp. 2d 944, 955-57 (E.D. Mich. 2004) (dismissing right of publicity claims and finding documentary's use of name and likeness was protected under First Amendment); *Joseph Burstyn v. Wilson*, 343 U.S. 495, 501-02 (1952) (noting that motion pictures, like books and newspapers, are protected, expressive works despite the significant revenue derived from them).

Likewise, the marketing of a docuseries, such as via the use of trailers, is not a commercial purpose. *See e.g.*, *Nichols*, 334 F. Supp. 2d at 957 ("if a video documentary contains an uncontested, though protected, use of a person's likeness, there is little question that an advertisement for the documentary containing a clip of that use would be permissible"); *Esch v. Universal Pictures Co.*, No. 6:09-cv-02258, 2010 WL 5600989, at *5-6 (N.D. Ala. Nov. 2, 2010) (trailer "protected under First

---

[15] The elements of common law invasion of privacy coincide with the elements of unauthorized publication of name or likeness codified in Section 540.08, Florida Statutes. *Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d 1205, 1213 (M.D. Fla. 2002); *Almedia v. Amazon Inc.*, 456 F.3d 1316, 1320 n. 1 (11th Cir. 2006).

Amendment"). To hold otherwise "would have an unconstitutional 'chilling' effect upon the First Amendment." *Loft*, 408 So. 2d at 621.

Defendants did not need to obtain a release from Plaintiffs to use the footage in *Tiger King 2* or its promotional trailers. And there is nothing in any of the appearance releases that *prohibits* any use of the footage. Accordingly, Plaintiffs have no claim at all, much less one that can evade Defendants' First Amendment protections. Their breach of contract claim is merely a red herring, lacking any merit.[16]

### 2. The Pre-2019 Releases allow subsequent use.

Even if this Court were to accept that an appearance release was required to use the footage of Plaintiffs (a theory without merit), Plaintiffs' claim fails because the plain language of Pre-2019 Releases allowed such use.

To state a claim for breach of contract under New York law,[17] Plaintiffs must prove: the existence of a contract, adequate performance of the contract by the plaintiff, breach of the contract by defendant, and damages resulting from the breach. *RCN Telecom Svcs., Inc. v. 202 Centre Street Realty LLC*, 156 F. App'x 349, 350-51 (2d Cir. 2005). Plaintiffs' Complaint alleges Defendants began filming Plaintiffs in July

---

[16] Although a claim for misappropriation or violation of the right of publicity would not be governed by New York law in this scenario, the outcome is still the same. New York's statutory right of publicity features a broad public-interest exception. *See* N.Y. Civ. Rights Law § 51; *see also Man*, 317 F. Supp. at 52 (film and its advertisements were in the public interest and did not violate right of publicity).

[17] Both the Pre-2019 Releases and the 2019 Agreements provide that New York law applies. (D.E. 1-10 ¶ 4; D.E. 1-11 ¶ 4); McBride Decl. ¶¶ 3-7, Exs. A-D.

2014. (D.E. 1 ¶ 22; D.E. 1-7 ¶ 14; D.E. 1-9 ¶ 11). According to the Complaint, Defendants obtained appearance releases for Plaintiffs twice, *i.e.,* the Pre-2019 Releases. (D.E. 1 ¶ 23; D.E. 1-7 ¶¶ 15-16; D.E. 1-9 ¶¶ 12-13). Plaintiffs allege Defendants never obtained location releases for Big Cat Rescue. (D.E. 1-9 ¶ 17) (sworn declaration of Howard testifying Plaintiffs did not provide a location release); (D.E. 4 at p. 4, 21).

The Pre-2019 Releases allowed Defendants to use the footage in connection with:

- the Picture;[18]

- all ancillary and subsidiary uses of the Picture;

- all advertising and publicity of the Picture; and

- exploitation of the Picture in any and all manner and media now known or hereafter devised.

(D.E. 1-10 ¶ 1(iii); D.E. 1-11 ¶ 1(iii)). Plaintiffs argue this language restricts Defendants to use of the footage in *Tiger King 1*. (D.E. 1 ¶ 39); (D.E. 4 at p. 4). They claim the use of "ancillary and subsidiary" pertain to merchandising or distribution rights and "neither term . . . is understood as a synonym to or substitute for the well-known industry phrases of sequel rights." (D.E. 4 at p. 4, 11-14). As a result,

---

[18] While the 2016 release defined the Picture as "Stolen World," the 2018 release defined the Picture as "untitled."

Plaintiffs (and their expert)[19] argue Defendants breached the agreements by using the footage in *Tiger King 2* and its trailers. *Id.*

Contrary to Plaintiffs' assertions, the plain language of the Pre-2019 Releases grants Defendants the right to use the footage in sequels. Indeed, *subsidiary* and *ancillary* rights in the film industry routinely include the rights to make sequels. *See, e.g., Team Play, Inc. v. Boyer*, No. 03-C-7240, 2005 WL 3320746, at *1 (N.D. Ill. Dec. 5, 2005) (describing a contract that referred to "sequels" as within the ambit of "ancillary products"); *Hollander v. C.I.R.*, 57 T.C.M. (CCH) 96 (T.C. 1989) (describing a party's reservation of "ancillary rights including remake, sequel, made-for-television motion picture and series rights."). In fact, the inclusion of *sequels* within the meaning of *ancillary* and *subsidiary* rights is so commonly understood that model contracts routinely include sequels within the definition of ancillary rights. *See, e.g.*, Thomas D. Selz, Melvin Simensky, Patricia Acton, Robert Lind, *Appendix A-75. Domestic distribution agreement*, Entertainment Law 3d: Legal Concepts and Business Practices (Dec. 2020) (referring to "all customary allied and ancillary rights including without limitation the right to act as distributor for any sequels, prequels or remakes" and "All collateral, allied, ancillary, subsidiary, publishing and merchandising rights of every kind and nature, without limitation, derived from,

---

[19] Plaintiffs' expert exclusively opines on contract interpretation which amounts to impermissible legal opinions and should be disregarded. *See* Fed. R. Evid. 702; *see also Walters v. Fast AC, LLC*, No. 2:19-cv-70, 2021 WL 877700, at *1, *3 (M.D. Fla. Mar. 9, 2021) ("expert witness testimony on an ultimate legal conclusion is not helpful to the trier of fact. Each courtroom comes equipped with a legal expert, called a judge").

appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation, reissue, remake, sequel, serial or series production rights by use of film"); *§ 9:213. Motion picture*, 3 U.C.C. Legal Forms § 9:213 (Oct. 2020) ("all collateral, allied, subsidiary merchandising and ancillary rights appurtenant or related to the Picture now or hereafter owned or controlled by the Borrower including, without limitation, the following rights: all rights to produce remakes or sequels to the Picture based upon the Picture"); Alexander Lindey, Michael Landau, *§7:16. Agreement for Acquisition of Television Rights of television and video rights with security interest*, 3 Lindey on Entertainment, Publ. & the Arts § 7:16 (3d ed. 2021) ("all collateral, allied, ancillary and subsidiary rights of grantor of every kind and nature, without limitation, derived from, appurtenant to or related to the rights, including, without limitation, all production, exploitation, reissue, remake, sequel, serial or series production rights by use of film").

Moreover, experts at the intersection of law and film routinely explain that *ancillary* and *subsidiary* rights include making sequels. *See, e.g.*, Jason Mazzone, *Copyright Easements*, 50 Akron L. Rev. 725, 763 (2016) (describing "ancillary rights" as including "remake, sequel, and television series rights"); Daniel M. Satorius, *From Book to Screen Mining Literary Works in the Movie Business*, 24-SPG Ent. & Sports Law. 1, 37 (2006) (defining "ancillary and subsidiary rights" as "merchandising, commercial tie-in, music, music publishing, soundtrack, interactive media, theme park, sequel and remake rights, etc."); Daniel M. Satorius, *Other People's Money: Financing the Low-Budget Independent Feature Film with Private Equity Securities Offerings*,

17

16-FALL Ent. & Sports Law. 11, 13 (1998) (referring to "ancillary rights including the rights to make sequels"); John M. Kernochan, *Moral Rights in U.S. Theatrical Productions: A Possible Paradigm*, 17 Colum.-VLA J.L. & Arts 385, 389 (1993) (describing theatrical sequels as within the realm of "subsidiary rights"); Anne Moebes, *Structuring Media Joint Ventures in the European Community*, 14 Hastings Comm. & Ent. L.J. 1, 23 (1991) ("One partner may wish to 'buy out' the other partners' ancillary rights, such as remake and sequel rights"); Jan D'Alessandro, *A Trade-Based Response to Intellectual Property Piracy: A Comprehensive Plan to Aid the Motion Picture Industry*, 76 Geo. L.J. 417, 465 (1987) ("Distributors will bargain for the right to exclusive income from 'ancillary rights,' for example, the right to produce a remake, a sequel, or a television series"); Susan Etta Keller, *Collaboration in Theater: Problems and Copyright Solutions*, 33 UCLA L. Rev. 891, 939 (1986) ("subsidiary rights" include creation of sequels).

Under the plain meaning of the Pre-2019 Releases, Defendants did not commit a breach by reusing the footage in *Tiger King 2*. And again, the Pre-2019 Releases do not prohibit any uses at all. Even if Plaintiffs' mistaken reading of the Pre-2019 Releases were to be accepted, there still is no contractual prohibition against any uses of the footage at issue in *Tiger King 2*.

### 3. Plaintiffs entered into subsequent agreements that also allow for use of the footage in later projects.

Plaintiffs' claim also independently fails because they each signed the 2019 Agreements, which supersede the Pre-2019 Releases and provide even broader rights

to the footage. *See, e.g.*, *Shehadeh v. Horizon Pharma USA, Inc.*, No. 20-cv-8107, 2021 WL 4176254, at *2 (S.D.N.Y. Sept. 14, 2021) ("[u]nder New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract."). For example, the 2019 appearance releases do not constrain the "Project" to preclude sequels. The 2019 location agreement is even more explicit, granting Defendants the right to:

> use and reuse the Recordings and Duplicates in and in connection with the Series, subsequent related and unrelated productions of any kind, as well as in and in connection with advertisements, promotions, publicity, clips and other materials, etc. for the Series and in any ancillary exploitation thereof.

McBride Decl. ¶ 7, Ex. D ¶ 2. Because the 2019 Agreements expressly permit related and even unrelated productions of any kind, Plaintiffs' contract claim has *no* likelihood of success on the merits, much less a substantial one.

### 4. Plaintiffs have not alleged compensable damage.

Finally, Plaintiffs' claim fails because they cannot recover the type of relief sought in the Complaint. Plaintiffs' Complaint requests injunctive rather than legal relief. (D.E. 1 at p. 20-21). But both the Pre-2019 Releases and the 2019 Agreements limit liability and explicitly state Plaintiffs may *not* obtain any injunctive or equitable relief against Defendants in connection with the footage. *See* (D.E. 1-10 ¶ 2; D.E. 1-11 ¶ 2); McBride Decl. ¶ 4, Comp. Ex. A at p. 5; ¶ 5, Comp. Ex. B at p. 4; ¶ 7, Ex. D ¶ 12. Thus, Plaintiffs are explicitly precluded from obtaining injunctive relief.

Plaintiffs also seek to recover damages for reputational harm flowing from the alleged breach. (D.E. 1 ¶ 43; at p. 29-31) (bemoaning *Tiger King 1's* portrayal of

19

"Carole as the villain" and contending that "Tiger King 1 was particularly harsh and unfair in its depiction of the Baskins and Big Cat Rescue"). But reputational harm is *not* compensable in a breach of contract claim under New York law. *See AmTrust N. Am., Inc. v. KF&B, Inc.*, No. 17-cv-5340, 2020 WL 5503479, at *1 (S.D.N.Y. Sept. 11, 2020) ("a plaintiff cannot recover for damage to reputation in a breach of contract action under New York law"); *Abate v. Fifth Third Bank*, No. 13-cv-9078, 2018 WL 1569260, at *7 (S.D.N.Y. Mar. 27, 2018) ("the alleged reputational damage asserted by Plaintiffs is typically not compensable under claims for breach of contract); *Saxton Commc'n Group, Ltd. v. Valassis Inserts, Inc.*, No. 93-cv-0388, 1995 WL 679256, at *2 (S.D.N.Y. Nov. 15, 1995) ("New York law generally does not allow contract damages for injury to reputation.").

Instead, damages for reputation in a breach of contract claim are permitted "only in exceptional cases and when plaintiff proves specific business opportunities lost as a result of its diminished reputation." *Saxton*, 1995 WL 679256, at *2 (citation omitted). Because Plaintiffs have not alleged or shown this to be the case, their claim for breach of contract fails for this additional reason.

**B. Plaintiffs cannot establish irreparable harm.**

Even if Plaintiffs were to establish a likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). This is because a showing of irreparable harm is the essence of injunctive

relief. *Id.* As Plaintiffs recognize, the irreparable injury asserted by a plaintiff seeking a preliminary injunction "must be neither remote nor speculative, but actual and imminent." *Id.*; *see also Holland Am. Ins. Co. v. Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant" to justify the granting of an injunction).

Plaintiffs' alleged harm is speculative at best. Plaintiffs contend they are entitled to a preliminary injunction because publication of the footage will cause irreparable reputational harm "for which monetary damages are insufficient." (D.E. 4 at p. 7). But short of repeating this blanket assertion throughout, Plaintiffs do not establish *how* publication of the footage will cause them irreparable harm. Rather, the arguments hinge on unsupported assertions that because *Tiger King 1* allegedly caused them harm, publication of the yet unseen footage in *Tiger King 2* will inevitably cause harm.[20] This does not establish irreparable harm.[21]

---

[20] Plaintiffs readily admit that they have already substantially suffered the alleged harm. (D.E. 1-8). Therefore, *if* Plaintiffs' reputations were tarnished, it was before the release of *Tiger King 2* or its trailer. *Guccione v. Hustler Mag., Inc.*, 800 F.2d 298, 303 (2d Cir. 1986) ("A plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject."). Under these circumstances, "a preliminary injunction would be very much like locking the barn door after the horse is gone." *Marcy Playground, Inc. v. Capitol Records*, 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998). Moreover, although Plaintiffs allege they were harmed by *Tiger King 1*, it is clear Plaintiffs leaned into and welcomed the publicity received in connection with its publication. It is reasonable to assume that Plaintiffs would continue to profit and would similarly reap the benefits of any publicity related to *Tiger King 2*.

[21] That the teaser trailer was released a month before the suit was filed also undercuts Plaintiffs' argument of imminent harm. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm"); *Tech Traders, LLC v. Insuladd Envt'l., Ltd.*, No. 6:18-cv-754, 2018 WL 5830568, at *4 (M.D. Fla. No. 7, 2018) ("failure to act with 'speed and urgency' is enough, by itself, to undermine a motion for preliminary injunction."); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (denying preliminary injunction because of plaintiff's 10-week delay noting

As this Court acknowledged when denying Plaintiffs' temporary restraining order, the anticipated harm alleged simply does not qualify as irreparable. (D.E. 8 at p. 3). Rather, Plaintiffs' legal theory for breach of contract contemplates an effective remedy at law, if proven, in the form of money damages. "Economic loss, even if difficult to quantify, is no basis for the entry of a preliminary injunction restricting speech." *Bollea*, 2012 WL 5509624, at *4; *See also In re King World Prods., Inc.*, 898 F.2d 56, 60 (6th Cir. 1990) (that plaintiff's economic damages may be difficult to quantify is no basis for injunctive relief). Plaintiffs have failed to establish a clear showing of immediate and irreparable injury, and the Motion should be denied.

### C. The balance of the harms favors Defendants.

Plaintiffs again bear the burden of showing that the perceived injuries outweigh the damages the injunction might cause. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). "In the case of a prior restraint on pure speech, the hurdle is substantially higher [than for an ordinary preliminary injunction]: publication must threaten an interest more fundamental than the First Amendment itself." *Procter & Gamble*, 78 F.3d at 226-27. Such relief aims to preserve the status quo. "Where the freedom of the press is concerned, . . . the status quo is to 'publish news promptly that editors decide to publish. A restraining order *disturbs* the status

---

"delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."); *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) ("a district court should generally consider delay in assessing irreparable harm" particularly where "the defendant had taken costly steps during the period of delay that would be at least temporarily undone by injunctive relief.").

quo and impinges on the exercise of editorial discretion.'" *Id.* at 226 (citation omitted) (emphasis added). "Rather than having no effect, 'a prior restraint, by . . . definition, has an immediate and irreversible sanction'" on the media defendant. *Id.* (citations omitted); *see also U.S. v. Quattrone*, 402 F.3d 304, 310(2d Cir. 2005) (Sotomayor, J.) (a "prior restraint is not constitutionally inoffensive merely because it is temporary"). Even if Plaintiffs could show some threatened irreparable harm and a likelihood of success on the merits, the Motion should still be denied because the relative hardships weigh heavily in favor of Defendants.

As discussed, Plaintiffs' allegations of hardship are speculative and remote. In contrast, Defendants will be severely harmed if an injunction were to be granted. Indeed, an injunction would prevent the imminent distribution of the highly anticipated *Tiger King 2*, causing Defendants significant financial harm. McBride Decl. ¶¶ 12-21; Dobson Decl. ¶¶ 8-10.[22]

Thus, weighing the speculative or non-unique harm to the Plaintiffs against the "significant but unmeasurable economic injury" to Defendants, the balance of hardships tips against an injunction. *J.R. O'Dwyer Co. v. Media Mktg. Int'l, Inc.*, 755 F. Supp. 599, 606-07 (S.D.N.Y. 1991) (balance of hardships in favor of defendants, where plaintiff offered only "conclusory assertion" of damage to revenues or reputation, and where defendants' allegedly infringing public relations directory had had substantial distribution, so that "the vast majority of whatever harm its

---

[22] Anti-SLAPP laws further recognize the harm to Defendants in cases such as this by awarding them their fees in defending against such lawsuits. *See supra* note 13.

publication [would] visit on [plaintiff] has occurred already"); *see also Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 258 (2d Cir. 2002) ("the equities weigh against halting a TV series now being aired because of alleged injury to a film sequel that is, at best, in the planning stage").

**D. The public interest weighs against granting a preliminary injunction.**

Finally, the public has an interest in the free flow of information, particularly amid issues of public concern. "This factor weighs heavily in favor of denying the plaintiff's motion. The public interest lies with the unfettered ability . . . to report" information to the public. *Religious Tech. Ctr. v. Lerma*, 897 F. Supp. 260, 267 (E.D. Va. 1995) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572-73 (1980)); *see also Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1365 (M.D. Fla. 2000) ("The public interest is served by the maintenance of First Amendment freedoms and could not possibly be served by the enforcement of an unconstitutional Ordinance."); *Rubin v. Young*, 373 F. Supp. 3d 1347, 1354 (N.D. Ga. 2019) ("The Eleventh Circuit Court of Appeals has held that 'the public interest is always served in promoting First Amendment values'").

As discussed, Plaintiffs' anticipated injuries do not qualify as irreparable. In contrast, an injunction would impair Defendants' First Amendment rights and impede public discourse on a matter of public concern. *See Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) ("The public's interest in free expression . . . is significant and is distinct from the parties' speech interests. By protecting those who wish to enter the marketplace of ideas . . . , the First Amendment protects the public's

interest in receiving information. Every injunction issued before a final adjudication on the merits risks enjoining speech protected by the First Amendment."). As this Court already found, enjoining the footage is *not* in the public's interest. (D.E. 8 at p. 4). Thus, Plaintiffs' requested relief would not only irreparably harm Defendants but also would disserve the public interest.

### III.    *Any Injunction Should be Conditioned Upon the Posting of a Bond.*

Federal Rule of Civil Procedure 65(c) requires the posting of a proper bond "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although Defendants submit the Motion fails as seeking an unconstitutional prior restraint and fails to satisfy the requirements for preliminary injunctive relief, should the Court grant the Motion, a bond in the amount of at least $100 million should be required. *See* McBride Decl. ¶¶ 12-21; Dobson Decl. ¶¶ 8-10.

### CONCLUSION

The Motion should be denied. It seeks an impermissible prior restraint and otherwise fails to meet the standard for enjoining free speech. An evidentiary hearing is futile, given the insurmountable constitutional hurdle.

Respectfully submitted,

*/s/ Rachel E. Fugate*
Rachel E. Fugate
Florida Bar No. 0144029
Deanna K. Shullman
Florida Bar No. 514462
Giselle M. Girones
Florida Bar No. 124373

Shullman Fugate PLLC
100 South Ashley Drive, Suite 600
Tampa, FL  33602
Telephone: (813) 935-5098
rfugate@shullmanfugate.com
dshullman@shullmanfugate.com
ggirones@shullmanfugate.com

*Attorneys for Defendants*

Of Counsel:

Russell A. Smith
*(pro hac vice motion forthcomig)*
SmithDehn LLP
654 San Juan Avenue,
Los Angeles, CA 90291
(917) 239-5047
rsmith@smithdehn.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 8, 2021, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system.

*/s/ Rachel E. Fugate*
Rachel E. Fugate