## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CAROLE BASKIN and
HOWARD BASKIN,

        Plaintiffs,

v.                          Case No. 8:21-cv-2558-VMC-TGW

ROYAL GOODE PRODUCTIONS
LLC, a New York limited liability
company, and NETFLIX, INC.,
a Delaware corporation,

        Defendants.

_____/

### REPORT AND RECOMMENDATION

    The plaintiffs filed a Motion for Preliminary Injunction to enjoin the defendants from releasing Tiger King 2 with footage of them and the Big Cat Rescue sanctuary. The first five episodes of Tiger King 2 were scheduled to air on November 17, 2021.[1]

    The plaintiffs argue that use of this footage in Tiger King 2 is unauthorized, and breaches the parties' Appearance Releases and Location Agreements. They contend further that, absent a preliminary injunction, they

---

[1] Since the filing and consideration of this motion, Tiger King 2 was released on Netflix on November 17, 2021. The plaintiffs argue that an injunction is warranted to prevent further irreparable harm.

will sustain irreparable injury to their reputations. The defendants, in response, persuasively argue that enjoining the release of Tiger King 2 is an impermissible prior restraint and, in all events, the plaintiffs have not satisfied the prerequisites for the entry of a preliminary injunction. I therefore recommend that the Motion for Preliminary Injunction (Doc. 4) be denied.

I.

Plaintiff Carole Baskin is the founder and CEO of Big Cat Rescue Corp., which operates a sanctuary for abused and abandoned exotic felines in Hillsborough County, Florida (Doc. 1-7, ¶2). Big Cat Rescue also engages in efforts to combat the abuse of big cats caused by private ownership, breeding in captivity, and the commercial exploitation of cub petting (id.).

Carole Baskin has appeared on national television programs and in magazines in connection with the plight of captive big cats, and she also has given lectures internationally on the issue (id., ¶¶5–6). Plaintiff Howard Baskin, who is Carole Baskin's husband, has been active in advocating for big cats for almost 20 years (Doc. 1-9, ¶3). He serves as Big Cat Rescue's secretary and treasurer and is on its board of directors (id., ¶2).

2

Defendant Royal Goode Productions, LLC (RGP) is a film production company based in New York (Doc. 1, ¶2). Defendant Netflix is a subscription service that provides on-demand streaming of movies and shows and produces its own original programming (id., ¶4).

In July 2014, Rebecca Chaiklin and Eric Goode from RGP met with the Baskins to discuss producing a documentary that was an exposé of the big cat breeding and cub petting trade, and asked the Baskins to participate (Doc. 1-7, ¶¶12, 13; Doc. 1-9, ¶¶9, 10). The Baskins agreed. RGP filmed the Baskins on several occasions over a time period of more than five years: July 23–25, 2014; April 29–30, 2016; April 3, 2018; May 16, 2019; October 10 & 17, 2019; and December 7, 2019 (Doc. 1-7, ¶14).

During that time, Carole Baskin entered into five appearance releases with RGP, and Howard Baskin entered into four appearance releases with RGP, all of which were drafted by RGP (Doc. 24, ¶3). The first Appearance Release was executed in 2014, and the most recent Appearance Release was signed in 2019 (id., ¶¶4, 5).

The 2019 Appearance Release agreements granted to RGP the right to use the film footage of the Baskins

> in and in connection with the production,
> exploitation, and/or distribution of the
> documentary motion picture currently entitled
> "Big Cats" (the "Project")," with the right to edit,

3

> distribute, exhibit, broadcast, exploit, promote,
> and advertise the Project, including excerpts
> therefrom, in any and all manner and media ....

(Doc. 24-1, p. 5; Doc. 24-2, p. 4).[2]   The Baskins understood that these

Appearance Releases authorized use of the footage to a single documentary

(Doc. 1-7, ¶15; Doc. 1-9, ¶12).

Additionally, the Baskins executed Location Agreements in

2018 and 2019, which authorized RGP to photograph and record at the Big

Cat Rescue sanctuary (Docs. 24-3, 24-4).  The 2019 Location Agreement

expressly provided that RGP may use the recordings for the project, as well

as "subsequent related and unrelated productions of any kind" (Doc. 24-4, p.

1).

RGP subsequently used the footage in a seven-part docuseries,

titled "Tiger King" (Tiger King 1), exploring the culture of people who

collect and breed big cats, (see Doc. 24, ¶2).  Tiger King 1 particularly

focused on Joseph Maldonado-Passage a/k/a "Joe Exotic," a prolific breeder

of big cats and purveyor of cub petting services, whom the plaintiffs accused

of abusing and exploiting wild animals (see id.; Doc. 1-7. ¶9).  Joe Exotic

---

[2]The pre-2019 Appearance Releases confirm the Baskins' "participation in the making of a documentary motion picture (the Picture)," and grant RGP the right to record, edit and use the recordings "in and in connection with the Picture and all ancillary and subsidiary uses thereof ...and to exploit the Picture in any and all manner and media ..." (Doc. 24-1, pp. 1–4; Doc. 24-2, pp. 1–3).

4

and the Baskins had a contentious relationship. The defendants describe

Tiger King 1 as centering on

> Joe Exotic's antagonistic relationship with Carole
> [Baskin], including Carole's criticisms of Joe's
> animal care and Joe's claims about the
> disappearance of Carole's ex-husband, Don
> Lewis. [Joe Exotic accused Carole of murdering
> Lewis.] The seventh episode concludes with Joe's
> 22-year conviction for violating the Endangered
> Species Act and his murder for hire plot aimed at
> Carole [Baskin].

(Doc. 23, p. 3). Unsurprisingly, Tiger King 1 was not what the Baskins

expected when they authorized RGP to film them and Big Cat Rescue.

Tiger King 1 was released on Netflix on March 20, 2020 (Doc.

25, ¶2). It was immensely popular; 64 million households watched it within

the first month of its release (id., ¶3). As a result of Tiger King 1, Carole

Baskin received a great amount of publicity, both negative and positive.

Carole Baskin stated that "Tiger King 1 wrongly attempted to

suggest that Big Cat Rescue abused its animals" and "[p]erhaps most

disturbing was the over-arching implication in Tiger King 1 that I was

involved in the disappearance of my first husband in 1997" (Doc. 1-7, ¶23).

Consequently, the Baskins received "'hate mail' in social media, memes,

texts, e-mails, internet comments and telephone voice mail messages totaling

in the tens of thousands," including messages accusing Carole Baskin of

5

murdering her first husband, and threats to her life (Doc. 1-7, ¶24; see, e.g., Doc. 1-8, pp. 2–16 ). Additionally, the Baskins are considering a permanent suspension of public tours of the Big Cat Rescue sanctuary (which they originally suspended due to COVID), for fear of violence against them (Doc. 1-9, ¶24).

On the other hand, Carole Baskin embraced the publicity garnered as a result of Tiger King 1, and essentially became a celebrity. She was contacted by over 100 media outlets, and even retained a major public relations agency to handle all of the inquiries (see Doc. 23, p. 4). She also accepted an invitation to compete on ABC's popular reality dance show, "Dancing with the Stars" (see id.). Moreover, she monetized her association with Tiger King 1. She offered personalized video messages on the Cameo app, on which she is identified as a "Netflix-Tiger King" star, and also sold facemasks with the "Hey all you cool cats and kittens" catchphrase that Tiger King 1 made popular (id., pp. 4–5).[3]

Based on the success of Tiger King 1, RGP elected to produce a sequel, Tiger King 2. After the release of Tiger King 1, Goode and Chaiklin contacted the Baskins, wanting to meet and "clear the air" (Doc. 1-

---

[3]Cameo allows users to hire celebrities to create short, personalized video messages.

7, ¶29; Doc. 1-9, ¶25). The Baskins "presumed that [RGP] was also going to try to convince" them to participate in the filming of the sequel, so they declined the meeting (id.). Carole Baskin believed that, by rejecting RGP, footage of them and Big Cat Rescue could not be used in a sequel (Doc. 1-7, ¶13).

On September 23, 2021, Netflix announced that there would be a sequel to Tiger King (Tiger King 2) (Doc. 24, ¶8). The first five episodes were scheduled for release on November 17, 2021 (id.).

Netflix released two trailers of Tiger King 2. Tiger King 2 further explores the exotic animal industry, and "one of the integral storylines of Tiger King 2 concerns Carole Baskin, and footage of the Baskins is used throughout the docuseries" (id., ¶11). The plaintiffs state that, since the release of the official Tiger King 2 trailer, they have experienced "a marked up-tick in hateful social media and internet comments" (Doc. 1-7, ¶33).

On November 1, 2021, the plaintiffs filed this lawsuit, alleging that RGP's use of the film footage in Tiger King 2 breaches the terms of the Appearance Releases (Doc. 1). The plaintiffs also filed with their Complaint an Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction (Docs. 3, 4), seeking to enjoin the scheduled release of Tiger King

2 on November 17, 2021, because it contains footage of them and the Big Cat Rescue sanctuary.   The plaintiffs assert that they are not trying to permanently stop the release of Tiger King 2, but request that it be delayed and that the defendants re-edit Tiger King 2 to remove footage of them and Big Cat Rescue.

The district court immediately considered the motion for a Temporary Restraining Order.   In an Order dated November 1, 2021—the same day the motion was filed—United States District Judge Virginia Hernandez Covington denied the motion, stating that the court was "not persuaded that the Baskins will suffer irreparable injury unless a temporary restraining order is issued or that the public interest favors entry of a temporary restraining order" (Doc. 8, pp. 4–5).   The court stated, in particular, that "it does not appear that inclusion of Defendants' footage of the Baskins will cause any immediate harm that cannot be compensated with monetary damages" (id., p. 3).

On the other hand, the court stated that it "takes no position on whether the Baskins will be able to establish entitlement to a preliminary injunction," and referred the plaintiff's Motion for a Preliminary Injunction to me for a report and recommendation (id., p. 5).

The defendants timely filed a memorandum in opposition to the Plaintiffs' Motion for Preliminary Injunction (Doc. 23). Initially, the defendants argue that the request to stop the scheduled release of Tiger King 2 "is a quintessential attempt at a prior restraint that would violate clearly established constitutional rights" (id., p. 7). Additionally, they contend that the "Plaintiffs have not come close to meeting their burden for injunctive relief" on any of the four elements necessary to warrant a preliminary injunction (id.). Moreover, RGP asserts re-editing Tiger King 2 to delete the Baskin footage would take approximately four months and cost several hundred thousand dollars (Doc. 24, ¶¶20, 21). The cost to Netflix to re-market and advertise Tiger King 2 if its release were delayed would exceed one million dollars (Doc. 25, ¶10).

The parties submitted evidence in advance of the hearing in accordance with Local Rule 6.02. The plaintiffs, with leave of court, filed a reply memorandum (Doc. 28). On November 15, 2021, I heard oral argument on the motion (see Doc. 29).

## II.

It was apparent to me at the outset that there is an issue whether the requested injunction constitutes a prior restraint of the defendants' First Amendment rights. The defendants' opposition focuses on that contention

9

(Doc. 23, pp. 7–10).    It is appropriate to address this issue first, as it implicates the defendants' constitutional rights and affects the evaluation of three of the four preliminary injunction factors.

The plaintiffs request an injunction stating that the defendants are "temporarily restrained and/or preliminarily enjoined from "[u]sing any film footage of the Baskins or the Big Cat Rescue sanctuary filmed by Royal Goode Productions ... in the sequel series entitled Tiger King 2" (Doc. 4, p. 25).   The only way that could be accomplished at this late date would be to halt the scheduled release of Tiger King 2 on November 17, 2021, and continue suspension of Tiger King 2's release until the series was re-edited to remove footage of the plaintiffs and the Big Cat Rescue sanctuary.

A court ordered injunction enjoining the viewing of an expressive work prior to its public availability is a prior restraint.  See Cooper v. Dillon, 403 F.3d 1208, 1215 (11th Cir. 2005) ("Classic prior restraints have involved judge-issued injunctions against the publication of certain information.").

A prior restraint on expression bears a "heavy presumption against its constitutional validity," New York Times Co. v. United States, 403 U.S. 713, 714 (1971), because "speech on matters of public concern ... is at the heart of the First Amendment's protection." Snyder v. Phelps, 562

U.S. 443, 452 (2011) (internal citations and quotations omitted).  Thus, "this 'most extraordinary remed[y]' [is appropriate] only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." CBS, Inc. v. Davis, 510 U.S. 1315, 1317 (1994) quoting Nebraska Press Association v. Stuart, 427 U.S. 539, 562 (1975).

"Speech on matters of public concern" is a broad concept. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Snyder v. Phelps, supra, 562 U.S. at 453 (internal citations and quotations omitted). Additionally, the arguably "inappropriate or controversial character of [the expression] is irrelevant to the question whether it deals with a matter of public concern." Rankin v. McPhereson, 483 U.S. 378, 387 (1987).[4]

---

[4]Notably, even allegations that the information was obtained unlawfully is usually insufficient to justify a prior restraint. See In re King World Productions, Inc., 898 F.2d 56, 59 (6th Cir. 1990) ("No matter how inappropriate the acquisition, or its correctness, the right to disseminate that information is what the Constitution intended to protect"); see, e.g., Bollea v. Gawker Media, LLC, No. 8:12-cv-02348-T-27, 2012 WL 5509624 (M.D. Fla. Nov. 14, 2012) (court refused to enjoin publication of sex tape excerpts even though the film was recorded illegally); Food Lion, Inc. v. Cap. Cities/ABC, Inc., No. 6:92-cv-00592, 1992 WL 456652 (M.D.N.C. Sept. 28, 1992) (defendants allegedly secured footage by defrauding the plaintiffs).

In this case, the requested injunction unquestionably implicates "speech on matters of public concern." Thus, the treatment and protection of big cats is of public concern, and it is the subject of ongoing legislation. Furthermore, the publicity the plaintiffs garnered from Tiger King 1 and their extensive advocacy efforts demonstrate that they are topics of general interest as well. Moreover, as indicated, the entry of an injunction like the one requested is a government act. See Cooper v. Dillon, supra, 403 F.3d at 1215. Therefore, the defendants' argument is persuasive that a court order enjoining the use of the plaintiffs' film footage, which would preclude Tiger King 2's scheduled release, is a prior restraint under the First Amendment.

The plaintiffs' primary argument is that the requested injunction does not constitute a prior restraint because they "simply seek to enforce the terms of their contracts" (Doc. 28, p. 4). More specifically, the plaintiffs contend that "parties are free to limit by contract publication rights otherwise available" (id., p. 3, citing Ronnie Van Zant, Inc. v. Cleopatra Records, Inc., 906 F.3d 253 (2d Cir. 2018); see also National Abortion Federation v. Center for Medical Progress, 15-cv-03522-WHO; 2016 WL 454082 (N.D. Cal.). This argument is unavailing.

Initially, it is noted that these cases are inapposite. Thus, in Ronnie Van Zant, Inc., the district court entered an injunction prohibiting a

12

film release based on an <u>express prohibition</u> in the parties' contract against exploitation of the history of the Lynyrd Skynyrd band.[5] Here, there is <u>no express prohibition</u> in the contracts against use of the footage in a sequel.

Additionally, the Second Circuit vacated that injunction on appeal. Notably, the court also stated that,

> even though the injunction here has allegedly been imposed as a result of private contract rather than government censorship, it nonetheless restrains the viewing of an expressive work prior to its public availability, and courts should always be hesitant to approve such an injunction.

The <u>National Abortion Federation</u> case cited by the plaintiffs is even further removed from the facts of this case because those parties agreed to the imposition of an injunction if they breached the agreement. 2016 WL 454082 at *2. There was no agreement to injunctive relief in this case. To the contrary, as the defendants note, the only mention of an injunction in these agreements is an express prohibition against them.

Furthermore, the plaintiffs' argument is unpersuasive because, as the Supreme Court recognized in <u>Shelley</u> v. <u>Kraemer</u>, 334 U.S. 1, 20

---

[5]The parties, former Lynyrd Skynyrd band members, entered into a consent Order that included restrictions on how they could use the name, likeness and images of Lynyrd Skynyrd. The consent Order expressly stated that "no such exploitation of life story rights is authorized which purports to be a history of the 'Lynyrd Skynyrd' band, as opposed to the life story of the applicable individual." 906 F.3d at 258.

13

(1948), government enforcement of restrictive agreements entered into by private parties are deemed to be acts of the government and, therefore, a party's constitutional right is not "ineffective simply because ... [the injunction] was defined initially by the terms of a private agreement." [6]

Additionally, citing to the Supreme Court's decision in <u>Shelley</u> v. <u>Kraemer</u>, the Second Circuit Court of Appeals held in <u>Crosby</u> v. <u>The Bradstreet Co.</u>, 312 F.2d 483, 485 (2d Cir. 1963), that a trial court has no authority to enter an order enforcing a private agreement restricting the dissemination of information.  The court elaborated, "that the parties may have agreed to it is immaterial." <u>Id</u>.  In this respect, it explained (<u>id</u>.):

> We are concerned with the power of a court of the United States to enjoin publication of information about a person, without regard to truth, falsity, or defamatory character of that information. Such an injunction, enforceable through the contempt power, constitutes a prior restraint by the United States against the publication of facts which the community has a right to know.

Therefore, I do not find persuasive the plaintiffs' argument that the First Amendment prohibition against prior restraint is inapplicable because the information would be withheld on the basis of a private contract.

---

[6]In <u>Kraemer</u>, the Supreme Court held that government enforcement of racially discriminatory agreements between private parties violated the Constitution.

14

The plaintiffs also attempt to obfuscate the prior restraint issue, arguing that they do not "seek to limit or to control the message of protected speech" but only the use of the Baskin footage in doing so (Doc. 28, pp. 4–5).   Additionally, at the hearing they argued that any delay in the release of Tiger King 2 would be temporary, as it could be released once the film footage of them and the Big Cat Rescue sanctuary are removed.   These arguments are unconvincing.

By removing the film footage, the plaintiffs advocate for a court injunction which changes the form of expression, if not the message itself. Furthermore, any court-imposed delay on the release of Tiger King 2, however short, is a constitutional violation because "a prior restraint, by ... definition, is an immediate and irreversible sanction." Nebraska Press Association v. Stuart, supra, 427 U.S. at 559; see also Elrod v. Burns, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

In sum, the plaintiffs have failed to satisfy their heavy burden to overcome the presumption that the requested preliminary injunction would be an unconstitutional prior restraint under the First Amendment.  The constitutional violation is, alone, sufficient grounds to deny the Motion for Preliminary Injunction.  Furthermore, as discussed below, the plaintiffs have

not shown that the extraordinary remedy of a preliminary injunction is warranted.

III.

In order to obtain a preliminary injunction, the plaintiffs must establish (1) a substantial likelihood that plaintiffs will prevail on the merits of the underlying cause of action; (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiffs outweighs the threatened harm the injunction may have on the defendants; and (4) that public interest will not be adversely affected by granting the preliminary injunction. International Cosmetics Exchange, Inc. v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2000).[7]

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). The goal of a preliminary injunction is to prevent irreparable harm and to "preserve the court's ability to render a

---

[7]"At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." Levi Strauss & Co. v. Sunrise International Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) (citation omitted).

16

meaningful decision after a trial on the merits." <u>Canal Authority of the State of Florida</u> v. <u>Callaway</u>, 489 F.2d 567, 573 (5th Cir. 1974).

Even assuming that the plaintiffs could overcome the constitutional concerns associated with a prior restraint on speech, the plaintiffs have failed to demonstrate that they are entitled to preliminary injunctive relief under the factors applicable in a preliminary injunction analysis. For example, the plaintiffs have failed to introduce evidence demonstrating that they would suffer irreparable harm if the defendants are not forced to remove the footage from the series, that the balancing of harm warrants entry of a preliminary injunction, or that the public interest would be served by the entry of a preliminary injunction.

A.      <u>Substantial Likelihood of Success</u>.

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success."  <u>See</u> <u>Schiavo ex rel. Schindler</u> v. <u>Schiavo</u>, 357 F.Supp.2d 1378, 1383 (M.D. Fla. 2005) (emphasis omitted), <u>aff'd</u>, 403 F.3d 1223 (11th Cir. 2005).

The plaintiffs allege in this lawsuit breach of contract, and the parties agree that New York law governs this determination.  The plaintiffs allege that their agreements authorized the defendants to use footage of them only in one series, what became known as Tiger King 1.  Therefore, they

argue, use of the film footage in Tiger King 2 is a breach of their contracts. The defendants contend that the contracts permitted use of the footage in subsequent projects. Therefore, for this prong of the analysis, the plaintiffs must show that they are likely to establish that the operative Appearance Release and Location Agreement limit use of the footage to one series and, concomitantly, the defendants' use of the footage in the Tiger King sequel is a breach of their agreements.

The parties, as indicated, entered into a total of nine Appearance Releases, and two Location Releases, between 2014 and 2019. Filming occurred between 2014 and 2019.

The defendants argue that the agreements under consideration here are the 2019 Appearance Release and the 2019 Location Agreement, because they "supersede the Pre-2019 Releases" (Doc. 23, p. 18). In this regard, the defendants cite authority that, "[u]nder New York law, [i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract." Shehadeh v. Horizon Pharma USA, Inc., No. 20 Civ. 8107 (AT), 2021 WL 4176254 at *2 (S.D.N.Y.) quoting Applied Energetics, Inc. v. New Oak Capital Markets, LLC, 645 F.3d 522, 526 (2d Cir. 2011).

The plaintiffs do not dispute the applicability of this authority to this case. Rather, the plaintiffs state in their reply that the subsequent "releases do not materially change any issue before the Court" and that "the legal analysis and outcome remains the same" for all of the Appearance Releases (Doc. 28, p. 2). Therefore, based on the plaintiffs' lack of objection, the 2019 Appearance Release and the 2019 Location Agreement govern this analysis.

1.    The 2019 Location Agreement permitted RGP to, among other things, use the photographs and footage of the Big Cat Rescue sanctuary in connection with the "series currently entitled 'Big Cats'[8]... and for any additional uses as described below" (Doc. 24-4, p. 1). Additional uses described below included the right to use the recordings in "<u>subsequent related and unrelated productions of any kind</u>" (<u>id.</u>, ¶2) (emphasis added). The only reasonable construction of this contract is that RGP is authorized to use the footage and photography in a sequel. Furthermore, since the 2019 Location Agreement supersedes the prior Location Agreement, that authorization applies to location footage filmed at any time.[9]   Therefore,

---

[8]The referenced series subsequently became Tiger King 1.

[9]The plaintiffs "withdraw their request to enjoin the use of location film footage in Tiger King 2 commencing on or about May 16, 2019" (Doc. 28, p. 2, n.1). However, the plaintiffs state that they "retain their request [for injunctive relief] regarding location

there is not a substantial likelihood that the plaintiffs will prevail on their claim that RGP is breaching the 2019 Location Agreement by using any of the recordings of the Big Cat Rescue sanctuary in Tiger King 2.

Additionally, the 2019 Location Agreement expressly precludes injunctive relief (id., p. 2, ¶12). Specifically, it provides: "Owner's sole remedy for breach of this Agreement by Company shall be an action at law for compensatory money damages …. Owner agrees not to seek, nor shall Owner be entitled to, injunctive or other equitable relief" (id.). Therefore, even if there were a cognizable breach of the 2019 Location Agreement, the plaintiffs' request for equitable relief would fail.

2.     The 2019 Appearance Releases grant to RGP (the "Producer") the right to use the film footage of Carole and Howard Baskin (the "Grantors"),

> in and in connection with the production, exploitation, and/or distribution of the documentary motion picture currently entitled "Big Cats" (the "Project"), with the right to edit, distribute, exhibit, broadcast, exploit, promote, and advertise the Project, including excerpts therefrom, in any and all manner and media ….

---

footage dating prior to May 16, 2019" (id.). This request is properly denied because the plaintiffs do not develop a cognizable argument why the 2019 Location Agreement does not apply.

The Appearance Releases continue to state:

> Grantor hereby releases Producer from all liabilities, claims and actions (including, without limitation, claims of defamation, false light, and invasion of privacy) which may be asserted in connection with the rights herein granted, and Grantor specifically waives any right to damages or to any injunctive or equitable remedies in connection herewith.

(Doc. 24-1, p. 5; Doc. 24-2, p. 4).

The plaintiffs argue that there is a substantial likelihood that they will prevail on their claim that the Appearance Releases do not authorize the defendants to use footage of them in Tiger King 2 (Doc. 4, pp. 8–21). They assert several arguments in support of this contention, but the most obvious, and most persuasive, is that the plain language of the Appearance Releases granted rights to use the footage in one documentary. See Eternity Global Master Fund Ltd. v. Morgan Guarantee Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004) ("Typically, the best evidence of intent [of the parties] is the contract itself; if an agreement is 'complete, clear and unambiguous on its face, [i]t must be enforced according to the plain meaning of its terms.'").

Thus, the 2019 Appearance Release defines RGP's right to use footage of the Baskins "in connection with … the documentary motion picture currently entitled "Big Cats" (the "Project") (Doc. 24-1, p. 5; Doc.

24-2, p. 4) (emphasis added).  As the plaintiffs argue (Doc. 4, pp. 10, 14), "the" is singular; it means one.  See Battery Associates, Inc. v. J & B Battery Supply, Inc., 944 F. Supp. 171, 176 (E.D.N.Y. 1996) (citation omitted) ("Words and phrases ... are given their plain meaning."). Therefore, it means one documentary, which, in this case, is Tiger King 1.  This conclusion is underscored by the absence of any reference to "sequel rights," or any plural references from which it is reasonable to infer the scope of the contract extends to other projects.[10]

The defendants assert several arguments that there is no breach of contract, ranging from the contention that no agreement was necessary to use the footage in Tiger King 2, to the argument that the use of the footage in Tiger King 2 was authorized in the pre-2019 Appearance Releases (Doc. 23, pp. 11–19).  None of those arguments is persuasive.[11]

_____

[10]The parties spend considerable effort on interpreting the meaning of the words "ancillary" and "subsidiary" uses (see Doc. 4, pp. 12–13; Doc. 23, pp. 15–18). However, neither word appears in the operative 2019 Appearance Releases (Doc. 24-1, p. 5; Doc. 24-2, p. 4). In all events, the defendants' interpretation of "ancillary" or "subsidiary" use to mean "sequel" is strained, as it does not comport with the language of the agreement as a whole.

[11]The defendants' argument that no agreement was necessary to use the footage is undermined by the fact that multiple Appearance Releases were signed that defined the parties' rights.  The defendants also argue that nothing in the Appearance Releases precluded the use of the footage in Tiger King 2.  However, the operative Appearance Releases define the right granted as the use of footage for "the Project"; therefore, in the absence of additional expansive language, it is implicit that the rights are limited to Tiger King 1.

22

The defendants also contend, in a conclusory manner, that the contracts "explicitly preclude [the plaintiffs] from obtaining injunctive relief" because the contracts expressly "limit liability and explicitly state Plaintiffs may <u>not</u> obtain any injunctive or equitable relief against Defendants in connection with the footage (<u>id.</u>, p. 19).

As pertinent here, the 2019 Appearance Releases state (Docs. 24-1, p. 5; 24-2, p. 4):

> Grantor hereby releases Producer from all liabilities, claims and actions … which may be asserted in connection with the rights herein granted, and Grantor specifically waives any right to damages or to any injunctive or equitable remedies in connection herewith.

The defendants' contention fails because, as the plaintiffs persuasively argue, the rights they granted were to use the footage in Tiger King 1 and associated promotions (<u>see</u> Doc. 4, pp. 15–17).  Therefore, the plaintiffs' waiver of claims and injunctive relief "in connection with the rights herein" and "in connection herewith" apply to Tiger King 1, not Tiger King 2.

Furthermore, the plaintiffs cogently argue that, if this release language applied beyond claims arising from Tiger King 1, the Appearance Releases "would become illusory" because RGP "would be released from any and all claims whether [RGP] respects its obligations under the Appearance Releases or not" (<u>id.</u>, pp. 16–17).

23

In other words, if RGP is released from all claims arising from use of the footage, the plaintiffs would have no recourse against RGP for using the footage beyond the rights that they granted. Such a construction of the release language is unreasonable. Credit Suisse First Boston v. Utrecht-America Finance Co., 915 N.Y.S.2d 531, 535 (2011) ("an interpretation that renders a contract illusory and therefore unenforceable is disfavored"); Jersey Insurance Co. of New York v. Parrish, 33 N.Y.S.2d 440, 442 (Co. Ct. 1942) ("a release ... should be construed reasonably, and, if it be ambiguous, against the draftsman").

Therefore, at this juncture, it does appear that the plaintiffs have stated a cognizable claim for breach of contract. However, the impairment of free speech pending resolution of this case, as well as the other preliminary injunction factors, weigh greatly in favor of denying the requested preliminary injunction.

B.    Irreparable Harm.

Irreparable harm is the "'sine qua non of injunction relief.'" Siegel v. Lepore, supra, 234 F.3d at 1176 (citation omitted). Absent a finding of a likelihood of an "actual and imminent" irreparable injury, preliminary injunctive relief is improper. Id. To satisfy this requirement a

movant must show a significant threat of irreparable harm, and not merely remote or speculative injuries.  Id.

The plaintiffs allege that using film footage of them and Big Cat Rescue in Tiger King 2 will cause irreparable harm to their reputations (Doc. 4, pp. 22–24).  In the Order denying their Motion for Temporary Restraining Order, the court stated that it was "not persuaded that the Baskins will suffer irreparable injury unless a temporary restraining order is issued" (Doc. 8, pp. 4–5), and elaborated that "it does not appear that inclusion of Defendants' footage of the Baskins will cause any immediate harm that cannot be compensated with monetary damages" (id., p. 3).

Further consideration of the plaintiffs' argument does not change the conclusion that the plaintiffs have failed to meet their burden to show that irreparable harm is likely to occur absent an injunction.

The plaintiffs claim that they will suffer irreparable harm to their reputations if the defendants are not preliminarily enjoined from using footage of them and Big Cat Rescue sanctuary in Tiger King 2.  In this regard, the plaintiffs acknowledge that their reputations are sullied, but argue that incremental irreparable harm to their reputations will occur if the footage of them and the Big Cat Rescue sanctuary are released in Tiger King 2.

A major hurdle that the plaintiffs are unable to overcome is that their reputations are already badly tarnished. Thus, plaintiff Carole Baskin acknowledges that, because of Tiger King 1, "millions of its viewers believe [her] to be a murderer" (Doc. 1-7, p. 12, ¶26).[12] The plaintiffs also assert that Tiger King 1 essentially portrayed them as big cat abusers (see Doc. 4, p. 5).

It is anticipated that Tiger King 2 will be more of the same. Consequently, it cannot reasonably be found that Tiger King 2 is likely to diminish their reputations enough to warrant an injunction.  See Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 303 (2d Cir. 1986) ("We have recognized that a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject."); Buckingham Corp. v. Karp, 762 F.2d 257, 262 (2d Cir. 1985) ("The linchpin of such interim relief is that threatened irreparable harm will be prevented by that injunction."). Thus, "a preliminary injunction here would be very much like locking the barn door after the horse is gone." Marcy Playground, Inc. v. Capitol Records, Inc., 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998).

---

[12]CBS News and Discovery Channel have also produced specials centered on the disappearance of Carole Baskin's ex-husband (see Doc. 23, p. 3, n.3).

Furthermore, an injunction would not appear to prevent any harm, as the injunction would not prevent the defendants from continuing to engage in innuendo about the disappearance of Don Lewis and the plaintiffs' treatment of big cats in Tiger King 2—it would simply bar the use of footage of the plaintiffs and the Big Cat Rescue sanctuary.

The plaintiffs argued at the hearing that further harm to their reputations would occur if the defendants are not enjoined from using footage of them in Tiger King 2 because viewers will falsely believe that the plaintiffs "endorse" Tiger King 2.   The contention that viewers would believe that the plaintiffs endorse being portrayed as big cat abusers, and Carole Baskin as a murderer, is frivolous.   In all events, that is complete speculation that does not state a basis for an injunction.

Additionally, the plaintiffs argued that including footage of them in Tiger King 2 will have a detrimental "magnifying effect."  Plaintiffs' counsel described this effect as using film footage to emphasize a negative message.  For example, counsel states that a negative comment can be paired with unrelated footage of the plaintiffs looking smug, thereby reinforcing the negative verbal message.   The notion of "magnifying" a pre-existing reputation as a murderer or animal abuser is unpersuasive and it does not justify the extraordinary relief of a preliminary injunction.

27

The plaintiffs argue further that airing footage of them on Tiger King 2 will further harm their reputations because it will mislead new viewers (Doc. 4, p. 23).  The number of new viewers, much less the number who will believe the innuendo, is gross speculation and, therefore, not a basis for an injunction.  See Hoop Culture, Inc. v. GAP Inc., 648 Fed. Appx. 981, 985 (11th Cir. 2016) ("A preliminary injunction may not be entered based only on a possibility of irreparable harm.").

Furthermore, as indicated, enjoining the use of film footage in Tiger King 2 does not preclude exposure of the alleged false allegations to a new audience.  It is also noted that the plaintiffs' concern about publicizing these alleged false innuendos to a broader audience lacks persuasiveness considering that the plaintiffs themselves exploited the publicity from Tiger King 1.  Thus, Carole Baskin's participation on "Dancing with the Stars," becoming a celebrity voice on the Cameo app, and sales of facemasks with the "Hey all you cool cats and kittens" catchphrase from Tiger King 1, exposed more people to Tiger King 1 and the negative innuendo about them.

Additionally, the plaintiffs argue that the harm to their reputations from Tiger King 1 has, and will continue to, adversely affect their ability to advocate for big cats (see Doc. 1-7, ¶26).  This contention is also unpersuasive and speculative.   Initially, it is noted, Carole Baskin

acknowledged that Tiger King 1 brought the big cat debate before a much wider audience (see Doc. 23, p. 5). Additionally, Tiger King 1 has been connected to reform in the industry and the indictment of wildlife traffickers (see id.).

Furthermore, other than uncertainty over resuming public tours at the Big Cat Rescue sanctuary (they were initially suspended due to COVID), the plaintiffs fail to allege with specificity how their ability to advocate for big cats will be harmed. To the contrary, the plaintiffs indicate in their declarations that they continue to make great strides in advocating for big cats, notwithstanding Tiger King 1's portrayal of them. Thus, Carole Baskin states that she is "frequently contacted by media around the world when there is a big cat incident in the news," she just finished filming another big cat documentary, and she detailed success in lobbying for the Big Cat Public Safety Act (Doc. 1-7, ¶¶5, 7).

As to the public tours of the Big Cat Sanctuary, the plaintiffs have stated that they may not reopen due to concerns of violence (id., ¶27). However, the harm to their advocacy efforts due to the possibility that public tours may not resume is vague and speculative, and certainly does not justify a preliminary injunction.

C.     Balance of Harms.

The court next evaluates whether the balance of harm to the moving party in the absence of an injunction would outweigh the harm to the opposing party from issuance of an injunction.  Grizzle v. Kemp, 634 F.3d 1314, 1320 (11th Cir. 2011).

The plaintiffs contend that the balance of harms favor the entry of the preliminary injunction because, "[i]n stark juxtaposition to the irreparable injury that [the plaintiffs] will suffer if their film footage is used in Tiger King 2 without their permission," the entry of an injunction would have a "rather nominal impact" on Netflix (Doc. 4, p. 24).  This argument, which does not mention defendant RGP, lacks merit.  Thus, as indicated, the plaintiffs' arguments that they will suffer irreparable harm absent an injunction are unpersuasive (see supra, pp. 25–30).  Furthermore, the defendants have convincingly argued that their harm if the injunction were entered is far from negligible (see Docs. 24, 25).

In this respect, the plaintiffs contend that "some brief delay or postponement" of the release date in order to remove the film footage would not meaningfully harm Netflix because it is unlikely that Netflix subscribers would cancel their memberships due to a delay in the airing of one program (Doc. 4, pp. 24-25).  They do not mention RGP's harm.  Furthermore, as set

forth in the defendants' affidavits, the defendants would incur substantial costs if Tiger King 2 were delayed to remove footage of the plaintiffs and the Big Cat Rescue sanctuary.

Jeremy McBride, an executive producer for RGP, estimates that extracting the footage and re-editing Tiger King 2 "would take a minimum of four months" and "the hard costs to re-edit Tiger King 2 would be a minimum of several hundred thousand dollars" (Doc. 24, ¶¶20, 21). McBride explains in detail the basis for these estimates. He states that "[i]t is not an easy task to remove even a short scene from a finished docuseries" because they would need to "remove not only the scenes at issue, but also all other scenes or story points that reference or depend on the excised scenes"; they would have to create a new sound mix; and, for international distribution, all new content would need to be translated (Doc. 24, ¶¶14–18).

Additionally, Sean Dobson, who is a manager of U.S. Nonfiction Marketing at Netflix, avers that a delayed release of Tiger King 2 would cost Netflix "more one million dollars, depending on the length of the injunction" (Doc. 25, ¶10). In this respect, Dobson explained that, "[i]f the release of Tiger King 2 is delayed, Netflix would lose the value of its advertising and marketing spends, which promoted a November 17, 2021 release for Tiger King 2. Netflix would [also] be required to incur significant

additional expenses in new promotion, advertising and marketing costs" (id., ¶9).

Therefore, it is clear that, in balancing the harms to the parties, damage to the defendants from the injunction would far outweigh the harm to the plaintiffs if the defendants could not release Tiger King 2 as scheduled.

D.    Public Interest.

The fourth factor typically asks if "granting [a] preliminary injunction will disserve the public interest." E. Remy Martin & Co., S.A. v. Shaw-Ross International Imports, Inc., 756 F.2d 1525, 1534 n.13 (11th Cir. 1985). In the Order denying the plaintiffs' Motion for Temporary Injunction, the court stated that it was not convinced that enjoining the scheduled release of the documentary because it included footage of the plaintiffs was in the public's interest, expressing concern that an injunction would impair "the promotion of free expression and robust debate" (Doc. 8, p. 4). Further consideration of this matter reinforces that conclusion.

The plaintiffs summarily argue that "[t]he public interest is advanced by permitting individuals to control how film depicting them is used. In contrast, delaying the release date of entertainment content does not adversely affect the public interest" (Doc. 4, p. 25). The defendants respond

that "the public has an interest in the free flow of information, particularly amid issues of public concern" (Doc. 23, p. 24).

The plaintiffs' contention that the public is not adversely affected by a delay in the release of Tiger King 2, and possibly re-editing of the series, is meritless.  As discussed in connection with prior restraint (supra, pp. 9–16), the injunction would impede speech on matters of public concern, which is at the heart of society's First Amendment rights. See Snyder v. Phelps, supra, 562 U.S. at 451–52.  Therefore, any court-imposed delay on the release of Tiger King 2, however short, would be a constitutional violation.   Elrod v. Burns, supra, 427 U.S. at 373–74. Moreover, aside from the constitutional issue, the injunction would stifle debate regarding abuse of big cats, which is clearly a matter that warrants public discussion.   Consequently, enjoining the release of Tiger King 2 because it contains footage of the plaintiffs clearly adversely affects the public more than the plaintiffs' stated public "interest … [in] permitting individuals to control how film depicting them is used" (Doc. 4, p. 25). Accordingly, the granting of the requested preliminary injunction under these circumstances would clearly disserve the public interest. See E. Remy Martin & Co., S.A. v. Shaw-Ross International Imports, Inc., supra, 756 F.2d at 1534 n.13.

33

IV.

For the foregoing reasons, I recommend that the Plaintiffs' Motion for Preliminary Injunction (Doc. 4) be denied.

Since consideration of this motion, Netflix released five episodes of Tiger King 2.  At the hearing, I asked plaintiffs' counsel if the requested preliminary injunction would be moot if the Report and Recommendation were not completed before Netflix released Tiger King 2. He responded that it would not.  It is noted, however, that with the release of Tiger King 2, the contention that irreparable harm would be prevented by a preliminary injunction is even more tenuous.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: NOVEMBER _19_, 2021.

### NOTICE TO PARTIES

The parties have fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.   28 U.S.C. 636(b)(1)(C).   Under 28 U.S.C. 636(b)(1), a party's failure to object to this report's proposed findings and recommendations waives that party's right to challenge on appeal the district court's order adopting this report's unobjected-to factual findings and legal conclusions.